Appeal of **WHITNEY-ROTH SHOE COMPANY.**                    Docket No. 89.

> Where the taxpayer presents satisfactory proof of the value of tangible assets as of the time of their acquisition by the corporate taxpayer, which assets constitute the paid-in surplus of the taxpayer for purposes of invested capital, the determination of the Commissioner to assess under sections 327 and 328 of the Revenue Act of 1918 is disallowed.

Submitted October 24, 1924; decided January 31, 1925.

*Sterling Newell, Esq.*, for the taxpayer.
*Robert A. Littleton, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

This is an appeal from the action of the Commissioner in disallowing the taxpayer's claim for paid-in surplus of $72,770.84 for the year 1918, and in proposing an additional assessment of profits taxes for the year 1918 amounting to $3,403.50. The Commissioner disallowed this sum as invested capital on the ground that he is unable to determine the amount of invested capital to which the taxpayer is entitled. Accordingly, he proposes to assess under section 328 of the Revenue Act of 1918. The Commissioner filed a motion to dismiss the appeal of the taxpayer on the ground that this Board is without jurisdiction to hear and determine appeals involving assessments under sections 327 and 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

1. The taxpayer is an Ohio corporation with its principal place of business at Cleveland, Ohio, and is engaged in the business of jobbing boots, shoes, and rubbers. The corporation was organized in June, 1917, for the purpose of acquiring the assets of Whitney, Wabel & Co., a partnership, and did acquire such assets as of March 1, 1917.

2. The partnership, Whitney, Wabel & Co., became financially embarrassed in the year 1916, and on August 2, 1916, the partners entered into an agreement with their creditors under the terms of which the business was conducted by a committee representing the principal creditors, until January 15, 1917. During this period the committee employed Fred Roth, an old employee of the partnership, to manage the business. Under this management 60 per cent of the old obligations was met. The business was so successful under his management that it was decided to allow Roth to form a corporation to take over and continue the business. Accordingly on January 16, 1917, the following contract was entered into:

CLEVELAND, OHIO, *January 16, 1917.*

The undersigned, being a partnership consisting of the Estate of Edwin E. Whitney, deceased, and Charles F. Wabel, engaged in the jobbing of boots, shoes, and rubbers in the city of Cleveland, for valuable considerations received by them from Fred Roth, hereby agree to sell and transfer to a corporation to be formed under the laws of the State of Ohio to be known as The Whitney, Roth Company, all the assets of the undersigned, including stock in trade, fixtures, accounts and bills receivable, good will, etc., upon the following conditions, to wit:

(*a*) Said Roth shall, before said conveyance is made, procure from all creditors of the undersigned an agreement on their part to accept payment of the amounts now due them as follows:

1. 50% thereof in money on or before March 1, 1917.
2. 50% thereof in first preferred 6% cumulative stock of the said company to be formed, the authorized issue of said stock to be limited to 50% of the outstanding debts of the undersigned. Until the complete redemption of said stock, the net income of said company shall be used as follows:

*First.* To pay 6% on said first preferred stock cumulatively.
*Second.* To pay 6% on the outstanding second preferred stock.
*Third.* To pay 6% on the outstanding common stock.
*Fourth.* 25% of the remainder of said net profits shall be set aside for a surplus for said company, and 75% of said remainder shall be used forthwith to redeem said first preferred stock at par.

(*b*) Before said conveyance is made said Roth and his associates shall pay in, or be able and willing to pay in to the said company the sum of $25,000 for common stock therefor.

(c) The value of all assets of the undersigned, except accounts and bills receivable, shall be fixed by agreement, or by decision of three parties, one of whom shall be chosen by the undersigned, a second by said Roth, and a third by the two thus chosen.

(d) At the beginning of each quarter commencing July 1, 1917, said company shall issue to the partners of Whitney, Wabel & Co. as their respective interests in said firm may appear on the books thereof, a second preferred stock without voting power, redeemable at par at any dividend-paying period, and carrying a dividend of 6% per annum, payable semi-annually, equivalent to the amount which has been realized by said new company in money during the preceding quarter from the assets of Whitney, Wabel & Co. over and above the total amount of said Whitney, Wabel & Co.'s debts as of January 18, 1917, which are to be liquidated by the new company as aforesaid.

| STERLING NEWELL. | WHITNEY, WABEL & CO., |
|---|---|
| CHARLES B. GRAY. | By CHARES F. WABEL. |
| | ESTATE OF EDWIN E. WHITNEY, |
| STERLING NEWELL. | By CHARLES F. WABEL, |
| CHARLES B. GRAY. | WILBUR R. WHITNEY, |
| | *Executors.* |

3. The taxpayer corporation received its charter and was actually organized in June, 1917, but took over the business of the partnership, together with its assets and liabilities, as of March 1, 1917. This transfer is incorporated in a contract dated June 19, 1917, as follows:

JUNE 19, 1917.

To THE WHITNEY-ROTH SHOE CO.,
*Cleveland, Ohio:*

The undersigned hereby offers to transfer, or cause to be transferred, to your Company all of the assets of the firm of Whitney, Wabel & Co., as of March 1, 1917, consisting of good will, leather and rubber merchandise, accounts and bills receivable, personal accounts, cash in the sum of $19.80, store fixtures, automobiles, and a lease on the four-story building, known as 1251 West Sixth Street, Cleveland, Ohio, for a period of five (5) years from March 1, 1917, at an annual rental of four thousand and eight hundred dollars ($4,800) per annum, payable in equal monthly installments of four hundred dollars ($400) each. The value of said assets as of March 1, 1917, exclusive of good will, has been estimated at $116,521.24. The above assets have been in the possession of the undersigned and the business thereof has been conducted by him since March 1, 1917, and all merchandise acquired and all earnings made since said date shall belong to your Company.

The undersigned further agrees to procure valid and binding subscriptions to one hundred (100) shares of your common stock at par.

In consideration whereof, if your Company accepts this offer, it shall:

1. Issue to me, or my nominees, 13,850 shares of your first preferred capital stock, of a par value of $5 per share, and an aggregate par value of $69,250.

2. Issue to me, or my nominees, second preferred capital stock of your company of a par value equal to the amount realized by you from said assets of Whitney, Wabel & Co. in excess of $69,250, said stock to be issued in installments at regular quarterly intervals, commencing March 1, 1918. The amount of said preferred stock so to be issued shall be arrived at as follows:

The value of the following items of the assets of Whitney, Wabel & Co. has been appraised as of March 1, 1917, as follows:

| | |
|---|---|
| Leather merchandise | $47,079.81 |
| Rubber merchandise | 12,543.95 |
| Store fixtures | 750.00 |
| Automobiles | 400.00 |
| Total | 60,773.76 |

To said total sum of $60,773.76 shall be added such amount as is realized in money before March 1, 1918, from the notes, accounts, and bills receivable and from the personal accounts of Whitney, Wabel & Co., which were unpaid on March 1, 1917, and from such total sum shall be deducted the

sum of $69,250, and the difference shall represent the par value of the second preferred stock which shall be issued.

Quarterly after March 1, 1918, the net amount realized in money from said notes, accounts and bills receivable and from said personal accounts in excess of the amount realized before March 1, 1918, shall be ascertained and second preferred stock shall be issued of a par value equivalent to the additional amount so realized.

3. Assume and agree to pay accounts payable of Whitney, Wabel & Company as of March 1, 1917, in the aggregate amount of $25,910.80, said accounts being shown in detail in the trial balance of Whitney, Wabel & Company as of that date, less, however, such of said accounts payable as have been satisfied by the undersigned since said date, but your company shall assume and agree to pay such debts and liabilities as have been incurred by the undersigned since March 1, 1917, and now remain unpaid.

4. Assume all obligations of Whitney, Wabel & Company under the lease for five (5) years commencing March 1, 1917, on the premises known as 1251 West 6th Street, Cleveland, Ohio.

Respectfully submitted.

June 19, 1917.                                             FRED ROTH.

Accepted:

THE WHITNEY ROTH SHOE CO.
By W. C. CAINE, *Prest.*

4. The certificates for the second preferred stock referred to in the above agreement, which were to be issued to the members of the old partnership of Whitney, Wabel & Co., were never issued but the persons entitled to that stock have been paid at the rate of 6 per cent per annum on the amount of such second preferred stock to which they were entitled under the above agreement.

5. The values of the various assets transferred by the partnership, Whitney, Wabel & Co., to taxpayer, were determined by the creditors' committee with the help of a special auditor employed for that purpose. They gave special attention to the accounts receivable. The testimony was to the effect that each item was carefully analyzed; the history of each account of each debtor was looked into, and in many cases personal investigation was made of the debtor himself. As a result of this survey, receivables of approximately $116,000 were pared down to $76,478.28, which sum was reported as a conservative valuation of such receivables. Mr. Fred Roth testified on this point as follows:

Q. State if you please what investigation this committee or any representative of it made to determine the actual value in money of the accounts receivable of Whitney, Wabel & Company as of March 1, 1917.

A. They employed Frank Wooden, an accountant, who was then with Dunn & McCarthy, to go over the books, and he continued some two months with me, and during this period we had continual meetings with the creditors' committee in going over accounts, analyzing them and putting them in various columns so that we could find out just what we thought they were actually worth.

Some of these accounts were discounted at a certain percentage and the others at others, and some were taken at face. We reviewed the past history of all of these accounts. I was familiar with most of them, knew a great many of them personally. There were a number of accounts that the committee wanted to talk with these men personally about, and brought them in. We had conferences with these fellows and brought their statements in and we set up figures that I thought were right, and Mr. Wooden looked over, and Mr. Spencer and Mr. Emerson, and we had charged off about $40,000, that was not included in the final set-up of some $80,000. My recollection is it was around $116,000 in accounts receivable that we pared down to something a little under $80,000, $78,000.

Out of this $40,000 we charged off we got in about $15,000, but all of the others that we set up in the original figures as some $78,000 we collected, with the exception of the Frank Lloyd account, which we have a contract guaranteed by Frank Lloyd. But all of the other accounts came in and there was

later a single account that varied from our original figures that we finally set up. Of course, we had been running that business along about five months, and we could tell pretty well how these accounts were coming in. To my personal knowledge a lot of these men induced them to do this for the company that they probably otherwise would not have, and we got every cent of it outside of this account. * * * I do not know how we could go over it any more carefully than we went over those accounts. In fact, there was no reason why we should not make them larger. The committee was continually hammering us to keep the account down so that they would know where they stood in regard to their first preferred stock.

Q. Is it your judgment that the values fixed on the notes receivable of $35,039.42 and on the accounts receivable of $76,478.27, represents a definitely ascertained value in money as of March 1, 1917, of the accounts and notes?

A. Yes, they were actual values.

Mr. Frank D. Wooden, the accountant referred to above, testified on this point as follows:

* * * Under the direction of this Committee, I made a very careful examination of the accounts receivable and bills and notes receivable of the partnership, item by item, to ascertain and appraise their value. In this process the history of each customer-debtor's account with the partnership, the nature of his business, his reputation and solvency were considered. It was the practice of this committee, by and with the advice and consent of Mr. Fred Roth, the active manager of the business, to hold personal interviews with debtors of the partnership wherever doubts of collectibility existed.

I can state that every effort was made to secure a conservative, reliable business appraisal of these accounts. Book values of over $116,000 were scaled down by the elimination of doubtful ones and discount of others to about $76,000. A similar minimum valuation was placed upon the store, furniture and fixtures and inventory of the partnership. The figures so obtained were included in the balance sheet of the corporation at its beginning, March 1, 1917.

On behalf of the Dunn & McCarthy Co., the second largest creditor, and from personal contact with other creditors, I can state positively that the assets, in particular the accounts receivable of the partnership as set out on that balance sheet, were considered soundly worth the value given them; that these creditors relied upon this valuation as a basis for the successful conduct of the new corporation; and that these creditors would not have permitted the continuation of the partnership business in corporate form, nor have cancelled approximately $69,500 of claims against the partnership in return for the first preferred stock of the corporation, except for the confidence which they placed in the assets appraised as aforesaid.

Mr. Sterling Newell who was counsel for these parties at the time of these transactions, testified at the hearing and his testimony was in effect the same as that of Mr. Roth and Mr. Wooden.

6. The values fixed by the creditors' committee of all the assets and liabilities of the partnership as of March 1, 1917, were used as the basis of the transfer of the assets of the partnership to the corporate taxpayer. The following table represents the values so fixed as of that date.

| ASSETS. | | LIABILITIES. | |
|---|---|---|---|
| Cash | $19.80 | | |
| Leather Merchandise | 47,079.81 | Bills payable (old) | [1] $11,500.00 |
| Rubber | 13,592.09 | Accounts Payable (old) | [1] 57,749.94 |
| Store Furniture & Fixtures | 750.00 | Accounts Payable, current | 25,910.80 |
| Automobile | 400.00 | Surplus | 78,908.94 |
| Bills Receivable | 10.00 | | |
| Notes Receivable | 35,039.42 | | 174,069.68 |
| Accounts Receivable | 76,478.27 | | |
| Personal Accounts | 700.29 | | |
| | 174,069.68 | | |

[1] Funded in 1st preferred stock July 1, 1917

61359°—26——30

The item in question in this appeal is that of surplus in the amount of $78,908.94 comprised, in the greater part, of the accounts receivable item of $76,478.27. Due to certain adjustments which are not here in question and which are acquiesced in by the taxpayer, this surplus item of $78,908.94 was adjusted for the year 1918 to $72,-770.84. The last mentioned figure is the one in controversy in this appeal.

7. The affairs of the taxpayer were investigated in 1921 by a revenue agent who reported and approved for 1917 the item of $78,908.94 as paid-in surplus and a total of $149,808.24 as invested capital. For 1918 he reported and approved $72,770.84 as paid-in surplus and $181,042.39 as invested capital. The Commissioner found that the receivables in question had a substantial value but found that he was unable to determine what such value was, and consequently was unable to determine invested capital of the taxpayer. Accordingly he computed the tax under section 328 of the revenue act of 1918 and proposed to assess an additional tax of $3,403.50 for the year 1918, as computed under the last-mentioned section. The Commissioner notified the taxpayer by registered letter dated July 3, 1924, of his determination. From such determination the taxpayer appealed to this Board, and filed his petition August 29, 1924.

#### DECISION.

The deficiency determined by the Commissioner is disallowed.

#### OPINION.

KORNER: The motion of the Commissioner to dismiss the petition for lack of jurisdiction in this Board to hear and determine appeals from deficiencies arising out of the application of the provisions of sections 327 and 328 of the Revenue Act of 1918, is denied in accordance with *Appeal of Oesterlein Machine Co.*, 1 B. T. A. 159, and *Appeal of Brownsville and Matamoros Bridge Co.*, 1 B. T. A. 320.

The Commissioner contends, (1) that the value of the receivables in question was uncertain and undeterminable; (2) that all the assets of the partnership, Whitney, Wabel & Co., were not in fact transferred to the corporation; (3) that the corporation was an agent for the collection of these receivables and acted as such agent for the partners, Whitney, Wabel & Co.; and (4) that the title to the accounts receivable was never vested in the corporation but that such receivables were borrowed capital, and that this is evidenced by the fact that the corporation failed to issue certificates evidencing the second preferred stock which under the agreement was to be issued to the partners of Whitney, Wabel & Co.

The principle involved here is very similar to that involved in the *Appeal of Brownsville & Matamoros Bridge Company, supra.* The question as to the value of the receivables transferred to the corporation is a question of fact, and we are convinced by the evidence in this appeal that the receivables had the value claimed for them by the taxpayer. We are unable to see how accounts receivable could be valued in any other way than that pursued by the creditors' committee in this case. The evidence convinces us that this valuation was carefully made and that in the absence of some evidence to the contrary should be taken as the true value.

A reading of the two contracts dated respectively January 16, 1917, and June 19, 1917, clearly indicates that it was the intention of the parties to convey outright all of the accounts and bills receivable of Whitney, Wabel & Co. to the corporation, and furthermore that this intent was effectuated. Both of these contracts specifically designate the accounts and bills receivable as items included in the transfer. We are of opinion that these assets were in fact transferred absolutely to the corporation and that the latter was not an agent of the partnership for the collection of these receivables.

The position of the Commissioner that the accounts receivable, representing the amount of second preferred stock which was to be issued, represent in fact borrowed money, appears to have been taken for the first time after the filing of this appeal. A careful reading of paragraph (d) of the contract of January 16, 1917, and paragraphs 1, 2, and 3, of the contract of June 19, 1917, indicates that in consideration of the transfer of its assets to the corporation, the partnership immediately received the cancellation of outstanding debts amounting to $69,250 assumed by the corporation, and in addition thereto the partners were to receive second preferred stock equivalent to the amounts realized from the assets over and above such indebtedness. A careful investigation of these accounts at that time showed that they had the value heretofore referred to. If the second preferred stock had been issued immediately to the partners of Whitney, Wabel & Co. in the amount of this paid-in surplus, this contention that these assets represent borrowed capital could not have been raised. However, in our opinion the evidence makes it clear that throughout this transaction the creditors were in fact saving the Whitney, Wabel Co. from bankruptcy by the organization of this new corporation. And so, while it was definitely understood and agreed that the second preferred stock should be issued to the partners, it was not improper or unusual for the issuance of the certificates to be deferred until the company had the actual working benefit of these assets. While the certificates were not actually issued, the amounts of such second preferred stock were credited on the books of the corporation in accordance with the agreement and the partners received regularly the dividends thereon. In our opinion the receivables represented by the second preferred stock are not borrowed money. Section 325 of the Revenue Act of 1918 defines borrowed capital as money or other property borrowed whether represented by bonds, notes upon accounts, or otherwise. Article 812 of Regulations 45 construing the above section of the act is as follows:

ART. 812. *Borrowed capital: securities.* Any interest in a corporation represented by bonds, debentures, or other securities, by whatever name called, including so-called preferred stock, if with respect to the payment of either interest or principal it ranks with or prior to the interest of the general creditors, is borrowed capital and can not be included in computing invested capital. Any such preferred stock may, however, be so included if it is deferred with respect to the payment of both interest and principal to the interest of the general creditors.

We do not entertain any doubt but that in case of insolvency or bankruptcy of the corporation the general creditors would have priority over any claim of the partners as to the assets here in question.

We are convinced by the entire record in this appeal that the receivables in question had the value claimed for them by the taxpayer and that they were transferred and vested absolutely in the corporation as of March 1, 1917, and that their value should properly be treated as paid-in surplus of the corporation. Owing to certain adjustments, above referred to, their value in 1918 was adjusted downward to $72,770.84, and therefore the paid-in surplus for the corporation for the latter years should be in the last-named amount. The invested capital for the corporation for the year 1918 should be computed accordingly.